Jansen Noyes et al., Trading as Hemphill, Noyes and Company, Appellants, v. Ben Gold, Individually and as Trustee, in Bankruptcy for George C. Hupka, Trading as George C. Hupka and Company, Appellee.

Gen. No. 41,402.

Original opinion filed February 26, 1941; rehearing opinion filed May 6, 1941.

BARRETT, BARRETT, COSTELLO & BARRETT, of Chicago, for appellants; EDWARD WOLFE and ROBERT E. WRIGHT, both of Chicago, of counsel.

ADAMS, NELSON & WILLIAMSON, of Chicago, for appellee; E. DOUGLAS SCHWANTES and RALPH CHOISSER, both of Chicago, of counsel.

## ON REHEARING.

MR. JUSTICE BURKE delivered the opinion of the court.

In their complaint filed October 23, 1939, in the circuit court of Cook county, plaintiffs, who are brokers, averred that on October 17, 1938, Ben Gold was the trustee in bankruptcy for George C. Hupka, doing business as George C. Hupka & Company (not Inc.) having been duly appointed and having qualified as such trustee in the District Court of the United States for the Northern District of Illinois, Eastern Division; that on October 17, 1938, he represented to the plaintiffs that as such trustee, or otherwise, he was

4

the owner and possessed of certain securities; that he then gave to the plaintiffs, as brokers, open orders, good until countermanded, to sell said securities on the open market at not less than certain indicated prices; that plaintiffs accepted the open orders and duly entered the same as open orders to sell the securities for the account of the defendant, Ben Gold, as trustee for George C. Hupka, doing business as George C. Hupka (not Inc.); that plaintiffs acknowledged the open orders by mailing to the defendant a confirmation; that in October and November, 1938, certain stocks covered by the open orders were sold at the prices specified by the defendant, on which transactions the securities were in due course delivered by defendant and the proceeds remitted to him by plaintiffs; that at various times thereafter plaintiffs notified and confirmed to the defendant that plaintiffs had on file for the account and risk of the defendant open orders good until canceled to sell the remaining securities; that open orders to sell the securities listed were at no time prior to September 5, 1939, countermanded or canceled by defendant; that plaintiffs diligently sought to sell the securities at the prices specified by defendant; that on September 5, 1939, in accordance with the open orders, plaintiffs did sell on the open-market the following of said securities at the prices indicated:

100 shares Butte Copper & Zinc at 5⅞
 85 shares Butte Copper & Zinc at 5⅞
600 shares Granby Consolidated Mines at 9
 10 shares Granby Consolidated Mines at 9

that plaintiffs immediately notified defendant of such sales and made due demand for the securities for the purpose of delivery thereof to the respective purchasers; that defendant failed or refused to deliver the securities; that plaintiffs were then successful in can-

celing the sales of 85 shares of Butte Copper & Zinc and 10 shares of Granby Consolidated Mines; that plaintiffs sought to obtain cancellations of the sales of 100 shares of Butte Copper at 5⅞ and the 600 shares of Granby Consolidated at 9, but were unsuccessful; that plaintiffs, being obliged to deliver such shares to the purchasers thereof, purchased on the open market 100 shares of Butte Copper at 6 and 600 shares Granby Consolidated at 10, and that the difference amounted to $816.03, for which sum plaintiffs asked judgment. Defendant Ben Gold, as an individual and as trustee, answered that in all his dealings with plaintiffs he acted only in his capacity as trustee and not as an individual; he admitted receiving from plaintiffs certain confirmations of his orders to sell until countermanded; stated that the last confirmation he received from plaintiffs was on or about March 29, 1939; denied the allegation that the open orders to sell were at no time prior to September 5, 1939, countermanded or canceled by him and asserted the fact to be that on or about April 1, 1939, he canceled all his outstanding orders with the plaintiffs and advised plaintiffs that he no longer wished to do business with them. He further denied that there was any duty on him to deliver any securities to the plaintiffs after he so canceled all outstanding orders. The case was tried before the court without a jury and resulted in a finding and judgment for the defendant and against the plaintiffs. This appeal followed.

The first point urged by plaintiffs is that the finding and judgment are against the manifest weight of the evidence. Under this point plaintiffs assert that the court erred in finding that they failed to prove their case by a preponderance of the evidence. The position of defendant is that the finding and judgment of the trial judge, who saw and heard the witnesses, is entitled to the same weight as the verdict of a jury, and

is supported by the evidence and the law and should be affirmed, and that the court correctly ruled that the burden was on the plaintiffs to prove their case by a preponderance of the evidence, which they failed to do. The general rule that the burden of proof rests on the party having the affirmative of the issue is applicable to actions on contracts and the usual test employed to determine on which side the burden of proof lies is to ascertain which party would be entitled to a verdict if no evidence were offered on either side of the issue. Where, however, a party having the affirmative of the issue has made out a prima facie case the burden of evidence as distinguished from the burden of proof may shift to the adverse party, but the burden of proof properly so-called, does not shift, and the party having the affirmative when the issues are made up must make out a case by a preponderance of the evidence. One who asserts that a contract has been abrogated or canceled by agreement has the burden of proof. The burden of proving a case by a preponderance of the evidence rests upon the party asserting the affirmative of the issue, and this never shifts during the course of the trial but remains with him to the end. The burden of proof is determined by the pleadings, and at the end of the case the pleader upon whom the burden rests must have sustained his position by a preponderance of the evidence. Plaintiffs cite cases in support of their proposition that the burden of proof to establish the countermanding of the orders to sell was upon the defendant. An examination of these cases discloses that the rulings are based on factual situations where the defendant asserted that the contract on which plaintiff based his action was canceled or abrogated by a subsequent agreement. In the instant case, plaintiffs by the allegations of their complaint, undertook to prove a contract. This contract, according to the complaint,

arose when the defendant "gave to plaintiffs, as brokers, open orders, good until countermanded, to sell said securities on the open market at not less than certain indicated prices," and when the plaintiffs "accepted said open orders and duly entered same as open orders to sell said securities for the account of the defendant, Ben Gold, as trustee for George C. Hupka, doing business as George C. Hupka & Company (not Inc.)." This contract empowered and obligated the plaintiffs to endeavor to sell the securities until the orders should be countermanded. It also obligated the defendant to deliver the securities when sold. The provision that the open orders were "good until countermanded" was an integral part of the contract. The burden of proof was on the plaintiffs to prove the contract and the breach thereof by a preponderance of the evidence. One of the elements of proof required of the plaintiffs was that at the time the orders to sell were executed, such orders had not been countermanded. The plaintiffs recognized the logic of this position in their pleadings and also in the order in which the proofs were submitted. Under the provisions of par. 4, sec. 43 of the Civil Practice Act it is contemplated that facts constituting an affirmative defense must be plainly set forth in the answer. As a general rule this defense is first raised by the defendant. If the plaintiff is convinced that the facts set up do constitute an affirmative defense, he then files a reply in order to arrive at an issue as to such facts. Otherwise, he moves to strike such alleged defense on the basis that in law it does not constitute a defense. In the case at bar plaintiffs did not file a reply, which is a further indication that they considered that the burden was on them to show by a preponderance of the evidence that the orders had not been canceled at the time they were executed. It is manifest therefore, that the court did not commit

error in holding that the burden of proving that the open orders were not countermanded was on the plaintiffs.

In order to determine whether the judgment is contrary to the manifest weight of the evidence, it has been necessary for us to carefully read the abstract and the exhibits, having in mind while doing so that the burden of proof was upon the plaintiffs. In 1937 Hupka & Company went into bankruptcy, owing the plaintiffs $50,000 or $60,000, for which plaintiffs held security. When the defendant was appointed trustee of the bankrupt estate in May, 1937, he caused certain of the securities held by the plaintiffs to be sold to pay the debt owing to plaintiffs. After this was done, the balance of the securities held by plaintiffs were turned over to the defendant. In October, 1938, defendant, as trustee of the bankrupt estate, had in his possession certain certificates representing unsold shares of stock which the defendant authorized the plaintiffs to sell under orders ''good until countermanded.'' Defendant fixed the prices at which the stocks were to be sold. Afterwards, some of the stocks so listed were sold, including North American Aviation. There was considerable delay in transferring the latter stock on the books of that company. Defendant denied he knew the reason for the delay. This incident is only important as a collateral matter in determining the credence to be given to defendant's testimony. Kelly R. Gilio, an employee of plaintiffs who was in charge of their mailing department, testified that the confirmations dated November 14, 1938, December 12, 1938, January 16, 1939, February 23, 1939, March 28, 1939, May 31, 1939 and July 19, 1939, were regularly mailed by him to the defendant in stamped envelopes from addressograph plates run off by him and deposited in the United States Postoffice. George C. Gordon, office manager of plaintiffs, testified that he first met the defendant in October, 1938;

that he made a list of the stocks defendant had for
liquidation; that he entered all of the stocks as open
orders; that between the date of listing the stocks as
open orders on October 17, 1938, and the subsequent
final sale thereof on September 5, 1939, some of the
stocks were sold; that on September 5, 1939, he re-
ceived the report of the sale of certain of the stocks
in the defendant's account and called defendant on the
telephone to give him (defendant) a report of these
sales; that the defendant told him he had sold these
securities six months before; that when the witness
(Gordon) asked defendant why he had not canceled
the open orders he had with the plaintiffs, defendant
said he did not know anything about ''that business'';
that defendant wanted to know how long an open
order was good and that witness told him an open
order was good until canceled.  The witness further
testified that up to September 5, 1939, plaintiffs had
received no cancellation of any of the open orders
from the defendant, nor any letters or telephone com-
munications pertaining to the cancellations; that on
September 5, 1939, he had a second telephone conversa-
tion with the defendant; that a few minutes after the
conclusion of this conversation he dictated to his
stenographer his recollection of the conversation; that
she transcribed the same; that in the second conversa-
tion he told the defendant he was able to cancel two
lots of the stock that were filled, but was unable to
cancel the larger ones; that he (Gordon) talked to de-
fendant on the telephone twice on the next day,
September 6, 1939, and had one of his secretaries who
could write shorthand listen in on the conversations
on an extension; that she afterwards gave him (wit-
ness) a correct transcription of the telephone conver-
sations; that the first conversation on September 6,
1939, was in the morning; that the witness told de-
fendant that one of the smaller securities had been
canceled and that plaintiffs' New York office had been

able to buy 100 shares of Butte Copper at only ⅛ loss, and that on the others he would find out about it and that he would advise defendant later in the day; that defendant said, "O.K., that will be swell"; that later in the day witness talked with defendant on the telephone and told him that the 600 shares of Granby Consolidated had been bought at $10; that defendant wanted to know for how much this stock had been sold the day previous, and that he was advised it had been sold for $9 per share, and that there was a $600 loss on that transaction; that defendant told the witness that he did not know what he could do about it; that he (defendant) should have given cancellations on the open orders. Witness further testified that it was the custom of defendant after the sale of stock to deliver the certificates to plaintiffs' office; that defendant did not deliver the 100 shares of Butte Copper or the 600 shares of Granby Consolidated, and that from October 17, 1938, to September 5, 1939, Granby Consolidated had not reached the price of $9 in the open market, and Butte Copper during the same period had not reached 5⅞ per share; that the first time such stocks reached these prices was on September 5, 1939, when they were sold. Hilda M. Johnson, private secretary to the resident manager of plaintiffs, and a stenographer of 25 years' experience, testified that she heard the telephone conversations between Gordon and defendant, which she took down in shorthand and correctly transcribed. The transcript was received in evidence and corroborates the testimony of Gordon. Charles Hofer, a former employee of plaintiffs, testified that certain records were made in the ordinary course of business and that defendant's orders were listed as open orders, and that he prepared and turned over to the mailing department confirmations of orders about which Gilio testified. Jack C. Sturtevant, resident manager for plaintiffs, testified as to the meaning of the term, "open order." Testimony in behalf of

defendant showed that the original order of October, 1938, was telephoned by defendant. Defendant admitted the employment of plaintiffs. He also admitted the receipt of the confirmation dated November 14, 1938, and also the confirmation dated March 28, 1939. He testified that on or about April 1, 1939, when he received from plaintiffs a statement of account dated March 31, 1939, he called plaintiffs on the telephone; that his brother Harry Gold and an attorney who had an office in the same suite, were present when he called plaintiffs; that he talked to either Gordon or Moerschbaecher; that he told the person to whom he talked that he had been waiting so long for his money on the North American Aviation stock that the plaintiffs had a "lot of nerve to send this confirmation," and that he said "I told him to cancel the order" and hung up; that defendant stated he sold the stock through another broker in August, 1939. He admitted the telephone conversation of September 5, 1939, but could not recollect talking to Gordon on the following day. He denied the telephone conversation of September 6, 1939, to which Gordon and Miss Johnson testified. Defendant testified that when he called plaintiffs on the telephone on April 1, 1939, he invited his brother, who worked for him, and an attorney who occupied a separate room in the same office, to listen to the conversation; that they did not listen on an extension telephone and made no memorandum of the conversation; that he did not notify plaintiffs in writing of the cancellation; that after the conversation of April 1, 1939, he did not receive any statements, but did receive other mail from plaintiffs; that in August, 1939, he sold the stocks in question through Schillinglaw, Crowder & Company, brokers. Defendant also introduced testimony that in October, 1938, plaintiff sold 60 shares of North American Aviation; that defendant delivered a certificate therefor to plaintiffs; that plaintiffs thereupon credited his account with the

purchase price; that by April 1, 1939, he had not received the purchase price, and because of his trust responsibility he had become anxious about this collection; that he had gone to the Securities and Exchange Commission about it; that he telephoned plaintiffs a great many times about it; that he discussed the matter with the attorney who had offices in his suite; that his brother, who was employed by him, likewise had many conversations with employees of plaintiffs concerning payment of this item; that defendant's brother Harry Gold and the attorney, possessed of full knowledge of defendant's dissatisfaction over the delay in remitting on this stock, were present at the telephone conversation wherein defendant alleges he canceled the open orders. From May through September, 1939, defendant was not away from his office, except for the period from August 11th to August 18th. Defendant was positive that he did not receive either of the confirmations dated May 31, 1939 or July 19, 1939, claimed to have been mailed to him by plaintiffs. Defendant's brother Harry Gold acted as office manager and opened all the mail received at the office. He was the only one in the office who opened mail during the period from March through September, 1939. He testified that he did not receive the confirmation dated May 31, 1939 or the one dated July 19, 1939.

Defendant had the right to cancel the open orders at any time without giving any reason therefor. He did, however, give a reason. That reason is that the delay in receiving payment for the North American Aviation stock which had been sold in October, 1938, caused him to be provoked. That is why he claimed he called plaintiffs' office on the telephone on April 1, 1939, and told them to cancel the orders. Defendant contends that he did not know what caused the delay in the transfer of the North American Aviation stock. The court refused to admit a copy of a letter dated

January 16, 1939, from Chadbourne, Wallace, Parke & Whiteside, attorneys for North American Aviation, Inc., addressed to plaintiffs at their New York office, concerning the transfer of the 60 shares of stock. These shares were registered in the name of ''Ben Gold, Trustee for Geo. C. Hupka & Co.'' These attorneys had requested and the trustee Ben Gold had furnished an affidavit, which recited that a claim had been filed for the 60 shares of stock by one Robert W. Mason. These attorneys stated in the letter of January 16, 1939 that their client was thereby put upon notice of conflicting claims; and they requested an order of court for the protection of their client. The court also refused to admit the copy of a letter dated March 21, 1939, addressed to plaintiffs from the same attorneys. This letter acknowledges the receipt of a certified copy of an order of the referee in bankruptcy dated March 3, 1939, directing the trustee to sell the 60 shares of stock. The letter, however, stated that the order did not constitute a complete record after adversary proceedings, as there was nothing therein to indicate that Mason, the claimant, was served with notice, or appeared before the court. Defendant denied he had seen either of these exhibits. Gordon, one of plaintiff's witnesses, testified he made copies of the letters and discussed the contents thereof with the defendant, and that copies were delivered by messenger to Gold's office. The court was in error in declining to allow the copies of the letters of January 16, 1939 and March 21, 1939, from Chadbourne, Wallace, Parke & Whiteside to be received in evidence. There was testimony that these copies had been discussed with the defendant. They were collateral to the main issue and were introduced for the purpose of testing the credibility of defendant's testimony. During one of the telephone conversations Gordon asserts he had with defendant on September 5, 1939, Sturtevant, plaintiff's resident manager, came

into Gordon's office, took the telephone and continued the conversation that Gordon had begun. Plaintiffs sought to show what this conversation was. The court refused to allow plaintiffs so to do on the ground that Sturtevant did not know who he was talking to. We are of the opinion that the trial court was in error in declining to admit this testimony as the parties to the conversation were sufficiently identified. The plaintiffs made out a strong case, well supported by documentary evidence and by facts and circumstances. The trial court commented adversely on the action of plaintiffs in having a stenographer take shorthand notes of the telephone conversations between Gordon and defendant while listening on an extension telephone without defendant knowing that she was listening. At the time of this conversation, the defendant had, through another broker, sold the stock which plaintiffs were calling upon him to deliver, and because of this either plaintiffs or defendant would suffer a loss. We do not wish to be understood as approving of eavesdropping on the telephone. This action is to be judged from surrounding circumstances. Plaintiffs undoubtedly anticipated that a law suit would develop if the defendant refused to make good the probable loss, and they knew that the *verbatim* report of the conversation would be valuable support for their position. No successful attack was made upon the testimony of Miss Johnson, or on the fact that she did take the stenographic notes of the conversation. From a remark made by the trial judge, it appears that he rejected the testimony of Harry Gold and of the attorney who had offices in defendant's suite, relating to their remembrance of the alleged conversation of April 1, 1939, wherein defendant asserts that he canceled his orders to sell. It is difficult to understand how the trial judge could believe the testimony of the defendant on the conversation and yet express disbelief that the two witnesses to such conversation, produced by defendant, were present at

the time of the conversation. It will be recalled that defendant testified that these two witnesses were in his office and heard the conversation.

The record also shows that the defendant well knew that the reason why he did not receive a remittance for the 60 shares of North American Aviation stock which had been sold in October, 1938 was because of his failure to secure the information and orders requested by Chadbourne, Wallace, Parke & Whiteside. He knew that this failure to remit for the 60 shares of stock was not due to any neglect by plaintiffs. The copies of the letters and other testimony showing the reason for the delay were admissible, as we have held, for the purpose of showing that on April 1, 1939, when defendant maintains he canceled the order, he knew that he had no good reason to charge plaintiffs with the responsibility for the delay in remitting the check for the 60 shares of stock. Another circumstance worthy of note is that on or about April 1, 1939, no controversy had arisen. The relations between the parties were on a friendly basis, and there was no reason why defendant should expect plaintiffs to decline to honor a direction to cancel the open orders. In the normal course of business, it is rather unusual for a businessman to call in witnesses for the purpose of having them listen to a telephone conversation about which no controversy is anticipated. Another phase of the testimony which the trial court should consider is that the defendant admits the receipt of the various confirmations that would not harm his defense, but denied receipt of the confirmations which would strongly support plaintiffs' case. From a thorough consideration of the record, we are convinced that the judgment is against the manifest weight of the evidence.

Defendant maintains that the ''good until canceled order'' remained in effect only so long as it remained uncanceled, and was also supported by the giving of a monthly confirmation. Defendant points out that

the record shows that plaintiffs failed to confirm the order at the end of the month of June, 1939, and again at the end of the month of August, 1939, and cites a text book as authority for his statement that the order remains in effect only when supported by a monthly confirmation. In our opinion the order which was given in this case remained in effect until canceled, regardless of whether plaintiffs sent a confirmation each month. The relations between the parties are governed by the law of contracts. Furthermore, this point was not made in the trial court and, therefore, cannot be raised on appeal. Defendant also argues that the uncontradicted evidence shows that he never dealt with plaintiffs in his individual capacity, and that, therefore, he is not personally liable on the contract. Plaintiffs insist that defendant is liable in his individual capacity. In the case of *In re Kalb & Berger Mfg. Co.*, 165 Fed. 895, (896) the court said:

"While ordinarily, a receiver [in bankruptcy] acting within his powers is not personally liable upon his contracts, yet he may so contract as to bind himself; and if he acts beyond his powers he necessarily assumes individual responsibility." We agree that the record shows that the relations between plaintiffs and defendant proceeded on the basis that defendant was acting as a trustee in bankruptcy and not in his individual capacity. However, when the defendant sold the securities in August, 1939, and permitted the open order to remain uncanceled (if the evidence shows he did so) he acted beyond his powers as a trustee and became individually liable.

For the reasons stated the judgment is reversed and the cause remanded to the superior court of Cook county with directions to proceed in a manner not inconsistent with the views expressed.

*Reversed and remanded with directions.*

HEBEL, P. J., and DENIS E. SULLIVAN, J., concur.